**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**

**ST. THOMAS AND ST. JOHN DIVISION**

SAVE CORAL BAY, INC.,
CORAL BAY COMMUNITY COUNCIL,
and DAVID SILVERMAN,

Plaintiffs,

NO._____

UNITED STATES ARMY CORPS OF
ENGINEERS, the DISTRICT
COMMANDERS FOR THE
JACKSONVILLE DISTRICT OF THE
ARMY CORPS OF ENGINEERS,
MATTHEW A. WESTCOTT and
BRANDON BOWMAN (in their official
capacity), and the CHIEF, PALM BEACH
GARDENS SECTION, ARMY CORPS OF
ENGINEERS (in her official capacity),

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I.      INTRODUCTION

1.      Pursuant to the Administrative Procedure Act, this Complaint challenges the approvals issued by Defendants, the United States Army Corps of Engineers and certain personnel from the Jacksonville District of the Army Corps (together, the "Army Corps") to the Summers End Group ("SEG") for the proposed construction of a mega-yacht marina, a boardwalk along the shoreline, associated uplands amenities such as off-site street parking, a restaurant, customs and border protection office, a marina office, a marina engineering office, a marina security office, crew shower, additional commercial space, facilities for fueling, solid

waste disposal, hazardous waste disposal, shore power supply and wastewater pump-out services within Coral Bay Harbor ("Coral Bay"), St. John, United States Virgin Islands ("USVI").

2. Directly related to this construction activity, SEG was required to provide compensatory mitigation for negative impacts on the environment. Collectively the marina construction and the related mitigation constitute the "Project."

3. The Army Corps' approvals for the Project included: (i) a permit for the construction of the marina pursuant to Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 ("Rivers and Harbors Act"), (ii) Nationwide Permit 27 under Section 404 of the federal Clean Water Act, 33 U.S.C. § 1344 ("Clean Water Act") and Section 10 of the Rivers and Harbors Act for three proposed mitigation components, and (iii) Nationwide Permits 1 and 18 also under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act to protect and stabilize a historic shipwreck (together the "Project Approvals").

4. Coral Bay is one of the most natural, undeveloped and beautiful embayments in all of the USVI, and certainly within St. John. It is home to well established aquatic vegetation, coral colonies and provides habitat for a wide variety of aquatic species, including those that are threatened and endangered.

5. Consistent with this description, in March 2015 the United States Environmental Protection Agency ("EPA") identified Coral Bay as containing Aquatic Resources of National Importance, including habitat for green sea turtles, extensive seagrass beds and submerged aquatic vegetation, and numerous coral species.

6. The construction approved by the Army Corps will directly harm, deteriorate and in some cases destroy the aesthetics, habitat and natural features of Coral Bay.

2

4152089_1

7.     A portion of the construction approved by the Army Corps occurs within the Virgin Islands Coral Reef National Monument on St. John, owned and managed by the United States National Park Service.  The Virgin Islands National Park encompasses more than 60% of the land area of St. John.

8.     The Army Corps has received over 27,000 letters, emails and comments from individuals and organizations in opposition to the Project, along with over 7,500 petition signatures in opposition.  The Army Corps has received only 13 letters in favor of the Project.  In addition to individuals, organizations that communicated directly with the Army Corps in opposition to the Project include the St. John Historical Society, Friends of Virgin Islands National Park, Coral Bay Yacht Club, League of Women Voters of the Virgin Islands and the National Parks Conservation Association.

9.     In issuing the Project Approvals, the Army Corps failed to adequately and independently evaluate, study, consider and mitigate the Project's negative impacts on habitat, endangered and threatened species, navigation, safety, economics, viewsheds and aesthetics, and acted arbitrarily, capriciously and not in accordance with law.

## II.     JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Rivers and Harbors Act, 33 U.S.C. § 401 *et seq.*, and the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.* ("CZMA").  The Court may issue a declaratory judgment and further relief under 28 U.S.C. § 2201 (declaratory relief) and § 2202 (injunctive relief).

4152089_1

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e), actions against an officer or employee of the United States or an agency of the United States or any agency thereof acting in their official capacity, because a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of this action is situated in this District, or because plaintiffs reside in this District.

## III.     PARTIES AND STANDING

### A.     Plaintiffs

12.     Save Coral Bay, Inc. ("SCB") is a 501(c)(3) domestic non-profit corporation located in Coral Bay, St. John.  Its mission is "to protect Coral Bay from environmentally damaging large-scale commercial projects and promote projects that will improve conditions in Coral Bay Harbor and encourage the sort of low impact development that will continue to grow the economy while protecting our cultural and natural resources for future generations to enjoy."

13.     Coral Bay Community Council ("CBCC") is a domestic 501(c)(3) non-profit corporation located in Coral Bay, St. John whose mission is to "serve our community by protecting the environment, improving infrastructure, supporting education, encouraging social progress, and planning for appropriate low-impact development."

14.     David Silverman is a full-time resident of St. John who lives on Bordeaux Mountain overlooking Coral Bay.  He is the President of SCB, and a current member and former officer of CBCC.

15.     SCB and CBCC have organizational standing because they have submitted numerous comments to the Army Corps in opposition to the Project.  These comments are directly germane to those organizations' missions in that they highlight the environmental impacts from the Project and relate to the issues raised in this Complaint.

4

16. Further, SCB and CBCC have and will suffer "injury in fact" that is direct, concrete, particularized, actual and imminent because the Project Approvals (i) directly conflict with organizations' core missions, purposes and activities, and/or (ii) divert CBCC's time, money and staff to contest Defendants' unlawful actions. The Project Approvals authorize SEG to commence construction immediately. SEG has publicly stated its intention to begin construction upon issuance of the Project Approvals. Once construction begins, the environmental injuries SCB and CBCC seek to prevent will be irreversible, including permanent destruction of seagrass beds, coral colonies, and aquatic habitat.

17. Specifically, SCB and CBCC have spent (i) significant financial resources on hiring attorneys and experts to comment on and contest the Project, and (ii) thousands of hours of staff time submitting comments, reviewing application materials submitted by SEG, interfacing with the Army Corps, other federal and Virgin Island agencies, testifying before the Virgin Islands legislature, and receiving and forwarding tens of thousands of letters and petitions opposing the Project.

18. The Army Corps' Project Approvals are the direct and proximate cause of the injuries SCB and CBCC have suffered and will continue to suffer. Absent the Section 10 Permit and Nationwide Permits, SEG cannot lawfully construct the Project, and the environmental damage SCB and CBCC seek to prevent will not occur. The requested judicial relief sought will redress those injuries by vacating the unlawful permits and prohibiting construction of the Project that threatens the environmental damage SCB and CBCC seek to prevent.

19. SCB and CBCC also have representational standing on behalf of their members. As a result of the Project Approvals, SCB and CBCC members, including David Silverman who

is a named Plaintiff, will suffer "injury in fact" that is direct, concrete, particularized, actual and imminent, including but not limited to, injury to members':

    a.      Aesthetic and viewshed interests. Members view Coral Bay every day and the Project will degrade those viewsheds substantially;

    b.      Recreational interests. Members regularly kayak, snorkel and boat in Coral Bay and the Project will directly affect the safety and enjoyment of those recreational activities due to increased and outsized vessel traffic and presence of permanent structures;

    c.      Interests in enjoying habitat, species and water quality. Members regularly enjoy the water clarity in Coral Bay and observe seagrass beds, fish, mollusks, marine mammals, sea turtles and other marine life that will be directly diminished by the Project's increased turbidity, shading, propeller wash, underwater and airborne noise, and degradation of water quality and other environmental damage;

    d.      Interests in safety. The Project does not adequately protect against damage to local residences because it is not designed to withstand wind speeds greater than 83 miles per hour. In addition, transportation of marine fuel, potable water and wastewater necessitated by the Project will substantially increase the number of large commercial tanker trucks on the winding, narrow Centerline Road. Also the proposed East Mitigation Area's tidal culverts will damage an existing private roadway that services residents who have not granted authorization to excavate the road and place culverts beneath it; and

6

4152089_1

e.     Interests in existing moorings.  The Project will eliminate moorings currently authorized by the United States Virgin Islands Department of Planning and Natural Resources ("DPNR") used by members for sailing in Coral Bay.

20.     David Silverman specifically will suffer "injury in fact" to the above-referenced aesthetic, recreational, safety and habitat, species and water quality interests.  Mr. Silverman has personally submitted voluminous comments on these issues and the injuries he will suffer.

a.     Mr. Silverman views Coral Bay daily from his residence on Bordeaux Mountain. The Project's 48-slip mega-yacht marina, boardwalk, and associated structures will occupy a dominant and recurring feature of his viewshed, fundamentally and permanently altering the natural, undeveloped character he observes and values.

b.     Mr. Silverman kayaks in Coral Bay waters several times during the year. The Project will introduce mega-yacht traffic, increased turbidity, propeller wash, and underwater noise in the areas where he kayaks, directly interfering with his recreational use and enjoyment.

c.     Mr. Silverman regularly walks and travels along roadways adjoining the shoreline of Coral Harbor where he observes and enjoys the open harbor, seagrass meadows, fringing mangroves and abundant marine and avian life.

d.     Marina construction will cause repeated pile-driving noise over an extended period of time, noise that Mr. Silverman will be able to hear from his home.

4152089_1

e.  These injuries to Mr. Silverman are imminent and concrete. Once construction begins, the viewshed alteration will be immediate and permanent. If the marina becomes operational, the increased vessel traffic and environmental degradation will occur continuously.

21.  The comments submitted by SCB, CBCC and Mr. Silverman relate to the issues raised in this Complaint.

22.  These injuries suffered by these members are germane to the missions and purposes of SCB and CBCC.

23.  The Army Corps' Project Approvals will directly cause the injuries to these SCB and CBCC members and the requested judicial relief sought will redress these injuries by prohibiting construction of the Project.

B.  **Defendants**

24.  Defendant Army Corps is a federal agency located within the Department of Defense and charged with administering permits under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899. The Army Corps' Jacksonville District Office issued the Project Approvals.

25.  Defendant's former District Commander for the Jacksonville District of the Army Corps, Brandon Bowman, issued the permit under Section 10 of the Rivers and Harbors Act and Nationwide Permit 27 under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act for the Project. The former District Commander performed his official duties at 701 San Marco Blvd., Jacksonville, FL 32207-8175. Commander Bowman is sued in his official capacity only.

8

26.     Defendant current Commander for the Jacksonville District Office of the Army Corps, Matthew Westcott, issued Nationwide Permits 1 and 18 under Section 404 of the Clean Water Act for the Project.  Commander Westcott performs his duties at the Jacksonville office.  Commander Westcott is sued in his official capacity only.

27.     Defendant Alisa Zarbo is Chief of the Army Corps' Palm Beach Gardens Section.  Ms. Zarbo was the ultimate primary reviewer of the Project Approvals and prepared the Memorandum for Record for all three of the Project Approvals.  Ms. Zarbo is sued in her official capacity only.

## IV.     <u>LEGAL BACKGROUND</u>

28.     To lawfully issue the Project Approvals, the Army Corps must find that the Project satisfies the detailed requirements of the Rivers and Harbors Act, the Clean Water Act and the CZMA.

### A.     <u>**Clean Water Act**</u>

29.     The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

30.     Congress pursued those goals, in part, through a permitting process.  Congress prohibited the discharge of "dredged or fill material into the navigable waters" without a permit, 33 U.S.C. §§ 1311, 1344, but gave the "secretary of the Army, acting through the Chief of Engineers," *id*. § 1344(d), authority to "issue permits, after notice and **opportunity for public hearings** for the discharge of dredged or fill material into the navigable waters at certain disposal sites," (emphasis added) *id*. § 1344(a).  *See also* 33 C.F.R. § 320.2(f) (Army Corps is authorized to issue 404 permit "after notice and **opportunity for public hearing**") (emphasis added).  These permits are generally known as Section 404 permits.

4152089_1

31. The Army Corps issues two types of Section 404 permits: individual permits and general nationwide permits. 33 C.F.R. § 320.1(c).

32. Any applicant for a Section 404 permit (or for a Section 10 permit under the Rivers and Harbors Act) for an activity that may result in a discharge to navigable waters, must provide the Army Corps with a certification from the State (or in this case the USVI) that the proposed discharge into navigable waters complies with water quality requirements under the Clean Water Act. 33 U.S.C. § 1341(a)(1). This is generally known as a 401 Water Quality Certification. No permit can be granted until the required certification has been obtained. *Id.*

33. The Army Corps regulations for issuing Section 404 (and permits under the Rivers and Harbors Act) reinforce this statutory requirement to obtain a 401 Water Quality Certification prior to issuing any permit. 33 C.F.R. § 325.2(b)(1)(ii) ("no permit will be granted until required certification has been obtained or waived.")

B.   **The Rivers and Harbors Act**

34. The Rivers and Harbors Act prohibits the unauthorized obstruction or alteration of any navigable water of the United States, including the construction of structures in or over navigable waters without a permit issued by the Army Corps. 33 U.S.C. § 403. These permits are generally referred to as Section 10 permits.

C.   **The Coastal Zone Management Act**

35. The Coastal Zone Management Act ("CZMA") requires that any federal permit that affects land or water use or natural resource of the coastal zone be carried out to the maximum extent practicable in accordance with the policies of state CZMA management programs designated under the CZMA. 16 U.S.C. § 1456(c)(3)(A).

4152089_1

36. Any applicant for a federal permit shall provide in its application to the federal agency a certification that the Project complies and is consistent with the States' CZMA program. 16 U.S.C. § 1456(c)(3)(A).

37. No permit shall be granted by the federal agency (including the Army Corps) "until the State or its designated agency has concurred with the applicant's certification . . ." *Id.*

38. The Army Corps' regulations for issuing Section 404 and Section 10 permits reinforce this statutory requirement to obtain a CZMA consistency determination from the designated agency prior to issuing any permit. 33 C.F.R. § 320.4(h). ("No permit will be issued to a non-federal applicant until certification has been provided that the proposed activity complies with the Coastal Zone Management Program and the applicable state agency has concurred with the certification . . .".) *See also* 33 C.F.R. § 325.2(b)(2).

39. The Virgin Islands Coastal Zone Management Act, 12 V.I.C. § 900 *et seq.* ("VICZMA") created the CZM Commission within DPNR. DPNR is the designated coastal zone management agency in the Virgin Islands pursuant to Section 306(c)(5) of the CZMA. Virgin Island Rules and Regulations ("VIRR") § 904-8(1).

40. The primary responsibility of the CZM Commission, acting through the island CZM committees for each of the three islands comprising the USVI, is to make all VICZMA permitting decisions and consistency determinations including those required by the federal CZMA. 12 V.I.C. §§ 904(b) and (d).

41. For minor projects, VI CZMA permits and consistency determinations are issued by the Commissioner within DPNR. VIRR § 904-8. For major projects, VI CZMA permits and consistency determinations must be issued by the CZM Committee for each respective island. *Id.*

11

42.     No CZM permit nor consistency determination for the Project can be made without approval by the CZM Committee for St. John for the Project.  Neither the DPNR Commissioner, the Governor nor the Legislature can supersede the St. John CZM Committee in this regard.  12 VIRR 904-8(1).

43.     Pursuant to these requirements, the Army Corps is prohibited from issuing any permits for the Project absent a valid CZM permit and consistency determination issued by the St. John CZM Committee of the Virgin Islands Coastal Commission.

D.     **The Army Corps' Regulations for Section 404 and Section 10 Permits**

1.     **General Permitting Requirements**

44.     The Army Corps' regulations detail extensive permitting requirements applicable to both Section 404 and Section 10 permits.  33 C.F.R. § 320(b) and (f).  The  Army Corps cannot lawfully issue a permit for the Project without complying with each and every one of the requirements set forth below.

45.     The Army Corps must determine whether the Project is in the public interest.  33 C.F.R. § 320.1.  This public interest review requires the Army Corps to evaluate probable impacts, including cumulative impacts of the Project, including without limitation, effects on conservation, economics, aesthetics, historic properties, fish and wildlife concerns, navigation, water quality and consideration of property ownership.  33 C.F.R. § 320.4(a).

46.     The Army Corps cannot issue a permit for the Project unless it determines that the Project is in the public interest.

47.     The Army Corps' regulations also contain the affirmative obligation that "the Corps is neither a proponent nor opponent of any permit proposal."  33 C.F.R. § 320.1(a)(4).

12

48.     The Army Corps' regulations establish a mandatory requirement that permits for "construction work, discharge of dredge or fill material, or other activities . . . **will** specify time limits for completing the work or activity."  (emphasis added)  33 C.F.R. § 325.6(c).

49.     The Army Corps' regulations state expressly that "it is essential to the **legality of a permit** that it contain the name of the district engineer as the issuing officer."  (emphasis added) 33 C.F.R. § 325.8(b).

### 2.     Requirements for Public Notice and Public Hearing

50.     Public notice by the Army Corps of an application for a permit pursuant to the Clean Water Act and the Rivers and Harbors Act "is the primary method of advising all interested parties of the proposed activity for which a permit is sought and information necessary to evaluate the probable impact on the public interest."  33 C.F.R. § 325.3(a).  The Army Corps "**will** issue a supplemental revised or corrected public notice if in [its] view there is a change in the application data that would affect the public's review of the proposal."  (emphasis added) *Id*. at § 325.3(a).

51.     For a project that requires a 404 permit, the public notice **must** contain a statement explaining how impacts associated with the proposed activity are to be avoided, minimized, and compensated for," and the "amount, type and location of any proposed compensatory mitigation . . . ." (emphasis added).  33 C.F.R. § 332.4(b)(1).

52.     The Clean Water Act contemplates that the Army Corps will hold a public hearing prior to issuing permits.  33 U.S.C. § 1344(a) ("The Secretary may issue permits, **after notice and opportunity for public hearings**. . .") (emphasis added).

53.     The Army Corps' regulations set forth the procedures for public hearings for both Section 404 and Section 10 permits.  33 C.F.R. § 327.

13

54. A public hearing is defined to mean "a public proceeding conducted for the purpose of acquiring information or evidence which will be considered in evaluating a proposed permit action . . . **and which affords the public an opportunity to present their views, opinions and information** on such permit actions . . ." (emphasis added). 33 C.F.R. § 327.3(a). This definition expressly includes **both** evidence gathering and a forum for public views and opinions.

55. Upon request for a public hearing, if issues raised are not resolved informally, the Army Corps "**shall** promptly set a time and place for the public hearing." (emphasis added) *Id.* at § 327.4(b). "In case of doubt, a public hearing **shall** be held." (emphasis added) *Id.* at § 327.4(c).

### 3. <u>Requirements for Mitigation</u>

56. Pursuant to both the CWA and the Rivers and Harbors Act, the Army Corps' regulations require compensatory mitigation for loss of aquatic resources. 33 C.F.R. § 332.

57. The "fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by [Army Corps] permits." 33 C.F.R. § 332.3(a)(1).

58. Section 332 sets forth a six-part hierarchy of preferred mitigation, with mitigation through off-site and/or out of kind mitigation being the least preferred. 33 C.F.R. § 332.3(b)(6).

59. The Army Corps' regulations establish stringent mitigation requirements for individual Section 404 permits. The Army Corps "**will** issue an individual Section 404 permit **only** upon a determination that the proposed discharge complies with applicable provisions of 40 CFR part 230, including those which require the permit applicant to take all appropriate and practical steps to avoid and minimize impacts to water of the United States." (emphasis added)

14

33 C.F.R. § 332.1(c)(2). The regulations at 40 C.F.R. Part 230 are known as the 404(b)(1) guidelines.

60. Pursuant to the 404(b)(1) guidelines "no discharge of dredge or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic system. . . ." 40 C.F.R. § 230.10(a). Practicable alternatives include both activities with no discharge or discharges at other locations. *Id. See also*, 40 C.F.R. § 230.5(c). This evaluation is commonly known as the 404(b)(1) alternatives analysis.

### 4. Use of Individual and Nationwide Permits Under the CWA

61. As a baseline, the Army Corps' regulations require that all activities must be included within one application: "All activities which the applicant plans to undertake which are **reasonably related to the same project** should be included in the same application," (emphasis added) 33 C.F.R. § 325.1(d)(2).

62. The regulations provide that the Army Corps should reject any application that does not comply with this requirement. *Id.* Section 325 provides as an example of what amounts to "the same project." Tellingly, that example is a marina project including dredging for access **and** fill for construction of the marina. *Id.*

63. Nationwide permits are a type of general permit designed to regulate activities having minimal impact with reduced paperwork and delay. 33 C.F.R. § 330.1(a).

64. An activity is authorized under a nationwide permit only if that activity and the permittee satisfy all of the nationwide permits' terms and conditions. 33 C.F.R. § 330.1(c).

65. In determining what permits an applicant needs, the regulations provide that the Army Corps "should review all **incoming applications for individual permits** for possible eligibility under regional general permits or NWPs [nationwide permits]." (emphasis added)

15

33 C.F.R. § 330.1(f). The Army Corps reviews eligibility under nationwide permits when the application is "**incoming**."

66. The Army Corps' regulations create a limited exception allowing for the combining of nationwide permits with individual permits for the same project, but "only if the portions of the Project qualifying for NWP authorization **would** have independent utility **and** are able to function or meet their **purpose independent of the total project**." (emphasis added) 33 C.F.R. § 330.6(d).

67. The Army Corps' nationwide permits were reissued in 2026. The reissued nationwide permits define "independent utility" as "a test to determine what constitutes a single and complete non-linear project in the Corps' regulatory program. A project is considered to have independent utility if it **would** be constructed absent the construction of other projects in the Project area." (emphasis added). 91 Federal Register 768, 884 (January 8, 2026).

68. In February 2026, the Caribbean District of the Army Corps of Engineers issued its Final Regional Conditions for those 2026 Nationwide Permits in the Caribbean District (SAA).

69. Pursuant to these Regional conditions, a pre-construction notice ("PCN") "is required for all projects in the Caribbean District's (SAA) area of responsibility, which includes projects within . . . the United States Virgin Islands." "PCN for activities in SAA shall be made using Form 4345."

70. Form 4345 requires that the applicant provide critical information regarding the nature, scope and extent of the Project (including a list of other certificates or approvals received from other federal, state or local agencies authorizing the application to do the work) and that the

16

applicant sign under penalty of perjury that the information is true and accurate.  Form 4345 **is** the required application for **any** nationwide permit in the United States Virgin Islands.

### 5. Protections Required for Mitigation Parcels

71. For any proposed compensatory mitigation pursuant to a Clean Water Act or Rivers and Harbors Act project, the applicant must demonstrate long-term, **perpetual** protection through real estate instruments for the properties on which the mitigation will take place.  33 C.F.R. § 332.7(a).

72. The placement of fill as part of mitigation on submerged lands in the United States Virgin Islands constitutes development as defined in the VICZMA.  12 V.I.C. § 902(1).

73. The VICZMA defines "Trust Lands" as all submerged lands conveyed pursuant to US Public Law 93-435, 48 U.S.C. § 1705(a), by the United States to the Government of the United States Virgin Islands "to be administered in trust for the benefit of the people of the United States Virgin Islands."  12 V.I.C. § 902(dd).

74. No person shall develop Trust Lands without securing a coastal zone permit under the VICZMA and a permit or lease for the submerged lands.  *Id*. at § 911(a)(1).  Fill on Trust Lands of the United States Virgin Islands requires a major VI CZMA permit.  *Id.* At § 910(d)(4).

75. The application for a VI CZMA permit involving development or occupancy of Trust Lands requires, *inter alia*, (i) a written statement of alternatives, and (ii) an environmental assessment report.  *Id*. At § 911(b)(1).  No such VI CZMA permit can be granted unless the Project is in the public interest and "there are no feasible, less environmentally damaging alternatives."  *Id*. at §§ 906(a)(8) and 911(c)(4).

76. A VI CZMA permit for submerged land must be approved by the CZM Committee for St. John and the permit and lease must be approved by the Governor and ratified

4152089_1

by the Virgin Island Legislature.  12 V.I.C. § 911(e).  VICZMA provides no alternative process for obtaining a valid VI CZMA permit for submerged lands.

77.     A VI CZMA permit has to have a definite term.  It is not perpetual.

78.     Issuance of a valid VI CZMA permit constitutes certification of CZMA consistency with the federal CZMA.

## V.     FACTUAL BACKGROUND

### A.     The Early Permitting Process

79.     SEG submitted an application for the Project on April 11, 2014.  The application expressly sought approvals of individual permits under both Section 404 of the CWA and Section 10 of the Rivers and Harbors Act.

80.     On September 16, 2014, the Army Corps determined that SEG's application was incomplete.  SEG submitted a revised application on September 22, 2014, again seeking both individual Section 404 and Section 10 permits.

81.     On October 16, 2014, SEG obtained a 401 Water Quality Certification from DPNR Division of Environmental Protection for both the water and land aspects of the Project. Paragraph 7.E of the Water Quality Certification contains a special condition stating: "The Water Quality Certificate **does not**[1] cover any dredging operations and/or insertion of fill material since these activities were not proposed in the Project's Environmental Assessment Report dated April 1, 2014 (water) and June 2014 (land)."

82.     The Water Quality Certification issued in 2014 for a completely different configuration of the Project, containing specific requirements arising from plans attached thereto,

---

[1] The bold type face is in the special condition itself and has not been added herein.

has never been modified or reissued, including authorizing any dredge or fill activities as part of compensatory mitigation, and SEG has never sought to do so.

83. Also in October 2014, SEG obtained a VI CZMA permit separately for the land and water portions of the Project as then constituted.

84. On January 7, 2015, the Army Corps issued its first public notice for the Project, acknowledging that SEG sought both individual Section 404 and Section 10 permits.

85. On April 9, 2015, the Army Corps required SEG to submit a third, revised permit application. SEG submitted the third application on May 30, 2015.

86. On July 9, 2015, the Army Corps published its Second Public Notice, describing a virtually identical project, and again stating that the Army "has received an application pursuant to Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act."

87. Based on public and agency comments, on October 22, 2015, the Army Corps sent its first Request for Additional Information ("RAI") to SEG.

88. On May 1, 2016, two parcels of lands initially within the Project footprint were sold. As a result of this sale, the Army Corps' first RAI, and EPA's public letter requesting permit denial, in August 2017 SEG submitted a major permit revision. SEG removed the two parcels, added a boardwalk and included a comprehensive structural redesign.

89. In September 2017, St. John experienced two category 5 hurricanes causing devastating damage to Coral Bay and exposing the actual danger to any marina not designed to withstand hurricane force winds.

90. Between October 2017 and December 2017, the Army Corps issued second and third RAIs to SEG highlighting basic flaws in the application regarding habitat impacts, wind

19

and wave calculations, water circulation, impacts to the Virgin Island National Parks and inadequate compensatory mitigation.

91. This process of formal written comments by the Army Corps and formal written responsive submissions by SEG continued until 2023 and was consistent with the Army Corps' traditional arm's length obligations under 33 C.F.R. § 320.1(a)(4) to act as neither a proponent nor opponent of a project.

**B.** **Federal Agency Consultation**

92. On July 10, 2018, the Army Corps initiated formal consultation with other federal agencies seeking those agencies' input on the Project. The other federal agencies included the National Marine Fisheries ("NMFS") PRD and HCD divisions and the United States Fish and Wildlife Services.

93. As the Army Corps had done three times previously, NMFS requested that SEG provide additional information and studies because, among other things, of the applications' deficiencies regarding habitat impacts, minimization efforts, alternatives analysis, water circulation, adequate water depth for large yachts and geotechnical information.

94. SEG did not provide any additional studies in response to the agency RAIs until December 13, 2019, over a year later.

95. The Army Corps was still not satisfied with the information SEG submitted. Therefore, on March 26, 2020, the Army Corps submitted its fourth RAI to SEG.

**C.** **The VI CZMA Permit Issues**

96. In the six years since SEG submitted its first permit application, SEG had not sought any updated VI CZMA permit addressing the significant changes it had made to the Project.

20

97. In addition, the VI CZMA Major Water Permit and Trust Land agreement issued to SEG in 2014 had never been approved by the Governor nor ratified by the Virgin Islands Legislature.

98. For this reason, SEG requested Governor Albert Bryan, Jr. to unilaterally modify the 2014 CZM Permit to reflect the significant changes to the Project, including consolidation of the land and water permits, and seek ratification by the USVI legislature.

99. As part of the modification and ratification of the VI CZMA permit, SEG and its lawyers submitted written and oral testimony to the USVI Legislature. In this testimony, SEG and its lawyers conceded that prior to issuance of any Army Corps permits for the Project, SEG required a submerged land lease pursuant to Section 911 of the V.I.C.:

> The Federal permit cannot be issued until the Virgin Islands approves a coastal zone management authorization for the Project, which includes the Legislature's approval of a submerged land lease.

Letter from Katherine R. English, attorney for SEG, to Novelle E. Francis, Jr., Senate President, USVI Legislature dated July 2, 2020.

100. The Governor did so and his unilateral modification was ratified by the USVI Legislature on December 15, 2020, which became its "Effective Date."

101. The modification was only to the consolidated VI CZMA permit. No action was taken to modify, update or reissue the Water Quality Certification to address the significant changes to the Project, or authorizing dredge or fill activities.

102. The Army Corps asserts that correspondence from DPNR Commissioner J. P. Oriol dated October 8, 2025, concludes that the Water Quality Certification is valid. That is inaccurate. Mr. Oriol's letter expressly relates only to modifications to the VI CZMA permit.

21

103. By its express terms, the VI CZMA permit as modified by the Governor and ratified by Legislature expired within one year, on December 15, 2021.

**D.    Continued Review and Project Modifications**

104. Between 2020 and 2023, the Army Corps and NMFS continued to identify an extensive list of deficiencies in SEG's application resulting in SEG making additional significant modifications to the Project.

105. SEG's post-2020 modifications to the Project included: (i) addition of three mitigation areas in submerged lands for mangrove islands and seagrass sloughs, which required dredge and fill activities, (ii) elimination of approximately twenty small vessel slips, (iii) change of fuel delivery by truck not barge, (iv) reduction in the designed wind speed protection to just 83 miles per hour, (v) discovery of a historic shipwreck and proposed avoidance measures involving placement of buoys and sandbags, (vi) change from vibratory pile driving to impact pile driving with increased acoustic impacts; and (vii) project impacts to newly designated endangered species (e.g., Nassau grouper, queen conch), (viii) major modifications to the estimated costs and economic justification for the project; (ix) proposed conversion of upland forest on Fortsberg peninsula to tidal wetlands; and (x) outplanting of 3000 coral starts in Coral Reef National Monument Waters.

106. The Army Corps itself concedes that "the project has undergone significant review and revisions since March, 2020." Section 10 Memorandum for Record at 189.

107. In January 2025, USVI CZM Director Marlon Hibbert emailed Ms. Zarbo and confirmed that "there have been modifications to that plan which VICZM would have to approve, but for which we have not seen a request from the applicant to date regarding these substantive changes."

22

4152089_1

108. SEG itself concedes that these very changes to the Project required VICZM review and modification of the VI CZMA permit. SEG principal Chaliese Summers stated publicly in 2025:

> Once the federal agencies finalized their review and specifically the environmental work, and with the support of DPNR and territorial officials, the territorial CZM permit will go through the process to be updated and extended to mirror the additional environmental work that is being added and incorporated to this project, the additional mitigation measures, the additional lands secured to make this possible and the reduction in size of the marina.

http://stjohnsource.com/2025/05/30/CZM-says-summers-end-marina-permit-has-expired/

109. In addition to these significant Project modifications, SEG submitted a benthic survey to support its assertion as to the scale of impacts from the Project.

110. In May 2023, the Army Corps determined that the benthic survey submitted by the Corps was "deficient and incomplete" and specifically called out the lack of justification for SEG's calculations on the impacts from the Project.

E. **The Army Corps' Changed Approach**

111. Plaintiffs submitted numerous requests of the Army Corps pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking correspondence and emails between the Army Corps and SEG. The Army Corps' FOIA responses demonstrate that prior to September 2023, the overwhelming number of communications between the Army Corps and SEG were formal letters, RAIs and comments on SEG's application materials, and SEG's formal written submissions in response thereto.

112. On September 7, 2023, an officer of a corporate investor in the SEG Project made a $25,000 contribution to the campaign of the United States Representative Garrett Graves. Mr. Graves was a member of the House of Representatives Committee on Natural Resources, the

23

Committee with direct oversight of the NMFS, a federal agency consulting on the review of the Project.

113. In November 2023, Representative Graves met with NMFS regarding the Project and throughout 2024 continued to advocate for approval of the Project.

114. Shortly after Graves' meeting with NMFS, the Army Corps drafted an "Expedited Informal Endangered Species Act Consultation" and sent it to the National Oceanographic and Atmospheric Administration ("NOAA"), of which NMFS is a branch.

115. Previously, consultation with NOAA and NMFS occurred pursuant to the more rigorous formal Section 7 consultation process, including a detailed review of compliance with the applicable provisions of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*

116. The Army Corps' FOIA response reveals continual updating of Graves' office during 2024 regarding the status of the Project review.

117. The Army Corps' FOIA responses further demonstrate that after November 2023, the Army Corps began corresponding with SEG informally, mainly through emails rather than formal comment letters and RAIs.

118. Contrary to 33 C.F.R. § 320.1(a)(4), the Army Corps' actions after September, 2023 demonstrate that the Army Corps' review of the Project became one of coordination and cooperation with SEG, and acceptance of SEG's technical assertions without independent review and evaluation by the Army Corps as set forth below:

### 1. The VI CZMA Dispute

119. In November 2024, Alisa Zarbo of the Army Corps asked USVI CZM Director Marlon Hibbert if the 2020 Modified CZM is still valid or had expired.

4152089_1

120. Mr. Hibbert responded in March 2025 with an email informing Ms. Zarbo that "the permit for Summers End Group is null and void."

121. By email dated April 7, 2025, from Ms. Zarbo to SEG's consultant, Ms. Zarbo stated that an update to the VI CZMA permit was required.

122. SEG then sent a letter to Governor Bryan requesting that he intercede.

123. On July 24, 2025, Governor Bryan met with the Army Corps on this issue and attempted to extend the VI CZMA permit subject to ratification by the USVI Legislature.

124. On August 28, 2025, the USVI Legislature rejected Governor Bryan's attempts to extend the VI CZMA permit. Before the Legislature, the St. John CZM Committee witnesses, the DPNR Commissioner JP Oriol, and the Chairwoman of the entire VI CZM Commission testified that all extensions need to go through the statutorily mandated process, and SEG had not done so. Consequently, the VI Legislature rejected Governor Bryan's bill by a vote of 9-3.

125. Undaunted, on October 3, 2025, at the request of Governor Bryan, the USVI Attorney General submitted a letter stating that "the CZM permit had not expired because the permit does not become operative until the necessary federal approvals are secured."

126. The Army Corps acted arbitrarily and capriciously by adopting this non-binding executive opinion *over* the express regulatory determinations of the St. John CZM Committee and the Virgin Islands Legislature, which had just rejected the Governor's extension attempt by a 9-3 vote.

127. Following the Attorney General's opinion, on October 27, 2025, the St. John CZM Committee reiterated to SEG and the Army Corps that the 2020 VI CZMA permit had expired.

25

4152089_1

128. The Army Corps disregarded the clear language of the permit, and the statement that the 2020 VI CZMA permit was automatically null and void as communicated by the sole government entity authorized under the VICZMA to approve any extension of the VI CZMA permit: the St. John CZM Committee.

129. The plain language of the modified VI CZMA permit states: "This permit shall be valid for one (1) year from the Effective Date." The Effective Date was December 15, 2020. By the permit's express terms, it expired on December 15, 2021—more than four years before the Army Corps issued the Project Approvals.

130. Neither the USVI Legislature nor the Governor has authority to unilaterally extend or revive an expired VI CZMA permit. Under 12 V.I.C. § 910 and VIRR § 904-8, only the St. John CZM Committee has statutory authority to issue or extend a VI CZMA permit for a major project on St. John.

131. Instead, the Army Corps deferred to an opinion of Governor Bryan, who had no legal authority to unilaterally extend the CZM permit.

### 2. Improper Bifurcation of Permits

132. For eleven years, from 2014 to 2025, the Army Corps publicly noticed and treated SEG's application, as a single project.

133. When the Army Corps reviewed the "incoming" permit application submitted by SEG in 2014, the Army Corps made no determination pursuant to 33 C.F.R. § 330.1(f) that SEG could satisfy its Clean Water Act permitting requirements through use of nationwide permits.

134. Moreover, at no time did SEG submit a PCN on Form 4345 for Nationwide Permits 1, 18 or 27 for the Project.

4152089_1

135. The only request by SEG for any nationwide permit was a two-paragraph email sent by Chaliese Summers on behalf of SEG on April 3, 2026, asking that the Corps authorize Nationwide Permits 1 and 18.

136. Nationwide Permits 1 and 18 address SEG's proposed activities to protect a historic shipwreck. Nationwide Permit 27 addresses SEG's proposed compensatory mitigation to address aquatic impacts arising directly and immediately from SEG's construction of the Project.

137. On April 8, 2026, the Army Corps issued Nationwide Permits 1 and 18 and a 34-page Memorandum for Record, five days after receiving Ms. Summers' email.

138. The Army Corps issued Nationwide Permit 27 on March 31, 2026, with no email from SEG, no application from SEG, let alone any PCN from SEG or Form 4345.

139. The Memoranda of Record for Nationwide Permits 1, 18 and 27 falsely state that the "PCN was coordinated with other agencies," and with "other Corps business lines," and that there was an "Evaluation of the Pre-Construction Notification (PCN)," despite that fact the Army Corps' counsel and FOIA officer confirmed in writing that no such PCNs were ever submitted.

140. 33 C.F.R. § 330.6(d) allows combining of individual and nationwide permits for the same Project **only** if the portions of the Project qualifying for a nationwide permit **would** both have independent utility **and** can meet their **purpose independent of the total Project.**

141. The Army Corps did not conclude that SEG "**would**" construct the compensatory mitigation if the Marina Project is not approved. All the Army Corps stated is that SEG "**could**" construct the marina, acknowledging that SEG would have little incentive to do so if the marina project is not approved.

27

4152089_1

142. Throughout the Project approvals, the Army Corps also states that SEG's compensatory mitigation is inextricably related to and not independent from the Marina Project.

143. For example, the introduction to Nationwide Permit 27 states that the document is "the proposed minimization and compensatory mitigation program for the proposed Summer's End Marina."

144. The Memorandum for Record for the Nationwide Permit 27 states that it "was intended ultimately to be relied on as compensatory mitigation for the Marina Project."

145. The Memorandum of Record also states the mitigation "that is under consideration for a Nationwide Permit 27 is intended to provide the required compensatory mitigation for the Marina Project if that project is authorized."

146. The bifurcation allowed SEG, *inter alia*, to avoid compliance with the Section 404(b)(1) guidelines for the marina, including the required 404(b)(1) alternatives analysis.

### 3. Flawed Compensatory Mitigation Review

147. The Army Corps must determine the amount of unavoidable impacts from the Project that must be offset by compensatory mitigation.

148. The Project cannot satisfy the public interest review required by the Army Corps' regulations unless the compensatory mitigation offsets these unavoidable impacts.

149. The Army Corps' approval of SEG's compensatory mitigation was fundamentally flawed in three respects: (1) the Army Corps artificially reduced the acreage of indirect impacts from turbidity from 28.44 acres to 0.34 acres without factual support, rendering the mitigation insufficient; (2) the Army Corps attributed 42% of the functional gain to an Eastern Mitigation Area that is infeasible and impracticable to construct, and (3) the Army Corps failed to

28

independently verify SEG's fill volume calculations, which understate the required fill by 400-500%. Each of these errors independently renders the Project not in the public interest and requires vacatur of the permits.

150. SEG proposed mitigation components (the Northern, Southern and Eastern mitigation areas) to offset the unavoidable impacts from the marina by restoring, enhancing and establishing 4.596 acres of mangroves and 0.975 acres of seagrass habitat, for a total of 5.594 acres.

151. The Army Corps concluded that a total of 1800 cubic yards of fill would be required to construct all three compensatory mitigation areas, with only 217 cubic yards of fill required for the Northern Mitigation Area.

152. In addition to this fill, creation of seagrass sloughs in the mitigation areas requires dredging by virtue of excavating sediment and moving it onto mangrove islands.

153. In conjunction with determining the total acreage of compensatory mitigation proposed by SEG, the Army Corps must also determine the acreage of direct and indirect impacts from the Marina Project.

154. From 2018 through at least May 2024, the Army Corps included turbidity to Coral Bay waters as an indirect impact from the Project that could impact up to 28.44 acres of habitat. In the formal consultation request of August 2025, the Corps concluded: "Therefore, the Corps believes that it could be reasonably expected that the operation of the marina would generate and maintain chronic high turbidity, worsening the already compromised water quality of Coral Harbor, and potentially result in extensive deterioration and loss of the seagrasses located therein."

29

155. Alleging that it was "based on the Corps' independent evaluation," the same August 2025 consultation in which the Corps stated its belief that the Project would result in extensive deterioration of seagrasses throughout Coral Harbor, the Corps reversed course and reduced the indirect turbidity impact value from the Project from 28.44 to only .34 acres.

156. The Army Corps' rationale for this deletion was SEG's amendment of the Project design "shifting docks into deeper waters."

157. The coordinates for the location of the docks has not in fact shifted.

158. Based on this reduction in indirect impacts, the Army Corps concluded that 2.39 acres in total would be directly and indirectly impacted by the Project.

159. Including even a small increase in the acreage of impacts from turbidity would have increased the total acreage impacted and rendered SEG's compensatory mitigation insufficient to conclude that the Project was in the public interest.

160. An evaluation of the functional gains from the mitigation acreage (5.594) and the functional loss from the acreage impacted by the Project (2.39 acres) represents the final step in determining the sufficiency of SEG's compensatory mitigation.

161. The Army Corps required SEG to calculate functional gain and loss using the Uniform Mitigation and Assessment Methodology ("UMAM".)

162. Rather than having SEG calculate the UMAM score and the Army Corps independently review SEG's calculation, Ms. Zarbo stated in a December 6, 2024, email to NOAA: "Here is the revised mitigation options that the applicant is proposing. I **helped them** with rough/draft UMAM scores for us to consider . . ." (emphasis added).

163. Although Ms. Zarbo provided NOAA with the UMAM scores, she never provided NOAA or NMFS with the volumes of fill for the proposed compensatory mitigation as part of

30

4152089_1

the Army Corps' consultation process. Fill volumes directly relate to potential impacts on habitat.

164. The Army Corps ultimately determined that the functional gains from the compensatory mitigation exceeded the unavoidable impacts from the Project by a razor thin margin (.8808 gain versus a .8773 loss, for a net gain of .0035.)

165. The Army Corps attributed over forty-two percent (42%) of the alleged total functional gain to the proposed Eastern Mitigation Area. The Army Corps' evaluation of the functional gain provided by the Eastern Mitigation Area is not supported by the record.

166. The Eastern Mitigation Area required SEG to acquire private property. By email dated January 2, 2025, Ms. Zarbo interjected the Army Corps into this private transaction by advising SEG's consultant: "Can you be sure Chaliese Summers knows not to purchase the lots/properties unless she receives a permit to do the work? We can move forward with getting the reviews done with the agencies, but I don't want her to purchase the lands until she has a final decision."

167. The Army Corps attributed a portion of the functional gain from the Eastern Mitigation Area to the conversion of what it characterized as forested uplands to tidal wetlands. Therefore, the Army Corps assigned the existing uplands conditions its lowest pre-construction score in calculating the post-construction functional gain.

168. The Army Corps' own permit documents and information submitted by Plaintiffs demonstrate to the contrary that pre-construction conditions at this portion of the Eastern Mitigation Area west of the roadway and nearest to the water consisted of hydric soils and existing white mangroves, red mangroves, and buttonwood. These are all primary indicia of existing wetland conditions. Additionally, the September 2025 site visit and report by NOAA

31

and the Corps reported significant constraints on the in-water area available for mangrove islands due to the presence of heathy seagrass beds.

169. The Army Corps also concluded that 1.4 acres of upland in the Eastern Mitigation Area could be converted to tidal mangrove by excavating only one foot of soil to wetlands elevations and placing two culverts under the roadway that separates this uplands area from the shoreline to lift tidal water to this elevation.

170. The elevations of the uplands range from 5.5 to 15.2 feet, requiring far more Irexcavation than only one foot, far above any inter-tidal zone to establish mangroves, and far higher elevations for any culvert beneath the road to lift tidal water to these elevations. There are no documents in the record demonstrating any assessment of the elevations west of the roadway and the feasibility of "removing 1 foot of soil" to achieve tidal wetland elevation.

171. Based on this information in the record, construction of the Eastern Mitigation Area is, in large part, not practicable nor feasible.

172. Elimination or reduction of functional gains from the Eastern Mitigation Area causes the functional losses in the UMAM scoring to exceed the functional gains, rendering the Project not in the public interest.

173. The Army Corps also inaccurately accepted SEG's calculations of the amount of fill required for the proposed compensatory wetlands.

174. By way of example, SEG stated that in the Northern Mitigation Area, minimal fill would be required for the mangrove islands because depth to water was only one foot.

175. Plaintiffs submitted information to the Army Corps that water levels in the area of the proposed Northern Mitigation Area were in fact four to five feet deep. The volume of fill

32

material in that area alone would increase from 217 cubic yards to at least a minimum 3823 cubic yards.

176. Similar water depth miscalculations exist for the other proposed mitigation areas resulting in a total increase in fill required for all three mitigation areas from 1800 cubic yards to between 6000 to 8000 cubic yards.

177. This increase in fill volume fundamentally changes the scope and habitat impacts of the mitigation projects, rendering the Project not in the public interest.

178. Contrary to its claimed independent evaluation of the indirect impacts from turbidity on Coral Bay habitat, the Army Corps did not independently evaluate SEG's calculation of the volume of fill needed for the mitigation areas, stating that the "Corps typically does not independently verify an applicant's engineering analysis," and issuance of this permit "was made in reliance on the information you [SEG] provided."

### 4. Submerged Lands Permitting Irregularities

179. On July 2, 2020, when SEG sought legislative ratification of its modified VI CZMA permit, SEG and its lawyers in a series of letters conceded that SEG needed to obtain a submerged land lease from the St. John CZM Committee, approved by the Governor and ratified by the USVI Legislature pursuant to Section 911 of the V.I.C. One of SEG's lawyer's wrote:

> As stated in my previous testimony, the Federal permit cannot be issued until the Virgin Islands approves a coastal zone management authorization for the Project, which includes the Legislature's approval of a submerged land lease.

180. SEG did not obtain these approvals for the submerged lands that are part of the mitigation parcels.

33

181. Instead, SEG and the Army Corps cooperated on a plan that circumvented 12 V.I.C. §§ 910 and 911.

182. Specifically, SEG proposed that in lieu of obtaining a submerged land lease for the mitigation areas pursuant to Section 911 of the V.I.C., it enter into a Memorandum of Understanding ("MOU") with DPNR and the VI Government.

183. Section 911 of the V.I.C. does not authorize activities in submerged lands through an MOU.

184. In addition, counsel for the Army Corps provided input and significant revisions and comments to multiple drafts of the MOU, an agreement to which the Army Corps was not even a party.

185. The MOU was not executed prior to the issuance of the Project Approvals.

### 5. Non-Responsive Answers to FOIA Requests

186. On October 17, 2025 Plaintiffs submitted a FOIA request to the Army Corps seeking SEG's current mitigation plan. Not having received a response, Plaintiffs submitted a second FOIA request seeking the same information on January 22, 2026.

187. The Army Corps responded on February 2, 2026, producing SEG's mitigation plan dated May 2025, even though the current version of SEG's mitigation plan was dated January 5, 2026, prior to the Army Corps' FOIA response.

188. The Army Corps did not provide Plaintiffs with SEG's current mitigation plan until April 10, 2026, after the Army Corps issued Nationwide Permit 27 authorizing the mitigation plan and eleven days before the Army Corps issued the Section 10 permit for the Project.

4152089_1

189. The Army Corps never provided supplemental public notice of the revised mitigation plans nor did it provide Plaintiffs with an opportunity to comment on the current version of the Mitigation Plan before the Army Corps issued the Project Approvals.

### 6. Denial of a Public Hearing

190. Throughout the decades long permitting process, thousands of individuals and organizations, including EPA, and the Virgin Islands Delegate to Congress, requested that the Army Corps hold a public hearing on the Project to express their views and opinions.

191. The Corps did not respond until April 21, 2026, when it denied the request. The denial letter was signed by Brandon Bowman, as District Commander. It was sent **after** the Army Corps had already issued the nationwide permits and just two days before issuing the Section 10 permit.

192. The Denial Letter states that the Army Corps "plan[s] to keep the public informed of our status by issuing a news release after we complete the application review process" even though that review had already been completed.

### F. Issuance of the Project Approvals

193. On March 31, 2026, then District Commander Brandon Bowman issued Nationwide Permit 27 to SEG.

194. On April 3, 2026, Colonel Bowman was replaced as District Commander by Lt. Colonel Matthew Westcott.

195. On April 8, 2026, Lt. Colonel Westcott issued Nationwide Permits 1 and 18 to SEG.

4152089_1

196. On April 23, 2026, just as he had done for the letter denying the public hearing request, Colonel Bowman issued the Section 10 permit to SEG, signing the permit as District Commander, which he was no longer.

197. The Section 10 permit leaves blank the date upon which construction of the Project must be completed.

198. General condition 5 of the Section 10 permit requires compliance with the 2014 Water Quality Certification, which is attached to the Section 10 permit as Attachment 2. The attached 2014 Water Quality Certification does not authorize any dredge or fill that will occur as part of the marina and mitigation construction activities.

199. The Section 10 permit does not contain an alternative analysis pursuant to the 404(b)(1) Guidelines.

200. The Section 10 permit relies on SEG's economic study from 2017, when there was low inflation and historically low interest rates, and does not account for a three-fold increase in the projected cost of the Project.

201. The Section 10 permit requires 1.5' minimum vessel clearance at mean low tide contrary to NOAA's consultation (to which the Army Corps agreed) requiring 2.5' minimum vessel clearance to avoid damage to seagrass beds.

202. Special Conditions 8 and 9 of the Section 10 permit require that site protection instruments for the mitigation areas must remain in "perpetuity."

203. The Memorandum of Record for the Section 10 permit falsely states that "the applicant demonstrated sufficient legal interest in the property, holding the necessary submerged land leases from the U.S. Virgin Islands government, which are required to undertake this project." The submerged land leases are in fact required to undertake this project, but SEG does

36

not hold them for the Project, including for the submerged lands impacted by the compensatory mitigation.

204. The Army Corps did not consider information from Plaintiffs' expert on impacts to sea turtle habitat, incorrectly claiming the Army Corps could not open the document.

205. The Nationwide Permit 27 does not authorize artificial, engineered features including culverts. SEG's mitigation requires two culverts for the Eastern Mitigation Area, and reinforced filter fabric with vertical retaining bars both of which are not authorized under the conditions of Nationwide Permit 27.

206. Nationwide Permit 27 issued to SEG did not properly evaluate or document the presence or impact to historic properties in any of the mitigation areas.

207. Special condition 143 of Nationwide Permit 27 requires an ecological reference area, i.e., that there is a naturally occurring example of the proposed mitigation in the same geographic region. SEG's mitigation includes the creation of mangrove islands. No mangrove islands exist currently or existed historically on St. John.

208. The Nationwide Permit 27 requires that prior to mitigation, SEG must stake areas with existing submerged aquatic vegetation and cannot work within those staked areas. A significant portion of the proposed mitigation areas have submerged aquatic vegetation, making construction of the required mitigation infeasible.

209. The Army Corps relied upon mitigation that falls within the least preferable type of mitigation in the Army Corps hierarchy, "offsite and/or out of kind mitigation." 33 C.F.R. § 332.3(b)(6).

37

## VI.    **FIRST CLAIM FOR RELIEF**

### A.    **The Army Corps' issuance of the Section 10 Permit violated Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.**

210.    Plaintiffs' incorporate by reference all preceding paragraphs.

211.    Under the Administrative Procedure Act, this Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), 5 USCS § 706. The Court shall also "compel agency action unlawfully withheld or unreasonably delayed" and hold unlawful action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D), 5 USCS § 706.

212.    In issuing the Section 10 permit, the Army Corps failed to adequately study, evaluate, consider and/or mitigate the degree to which the Project would obstruct and impede navigation in the Coral Bay Harbor in violation of 33 U.S.C. § 403.

213.    The Army Corps' conclusion that the proposed Project is not contrary to the public interest was arbitrary and capricious because the Army Corps failed to adequately evaluate and balance the following factors as required by 33 C.F.R. § 320.4(a): (i) conservation impacts, including destruction of at least 2.39 acresof seagrass beds and coral habitat; (ii) aesthetics and viewshed impacts to one of the most pristine embayments in the USVI; (iii) navigation and safety impacts, including inadequate wind speed protection (83 mph standard in a hurricane zone); (iv) cumulative impacts when considered with other development in Coral Bay; and (v) economic impacts, relying on a 2017 economic study that fails to account for tripled construction costs and changed interest rate environment.

4152089_1

214. The Army Corps' public interest review violated Section 10 of the Rivers and Harbors Act of 1899 because it failed to adequately study, evaluate and consider the Project's impacts on conservation, aesthetics, historic properties, fish and wildlife concerns, water quality, property ownership, navigation, safety, the general welfare of the public and economics. As a result, the Army Corps' public interest review was arbitrary and capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

215. The Army Corps failed to adequately consider the cumulative impacts of the Project in relation to or in tandem with other impacts to navigation and safety in Coral Bay.

216. The Army Corps' failure to hold a public hearing was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

217. The Army Corps' issuance of the Section 10 permit without a valid Water Quality Certification approving modifications to the Project after 2014 and authorizing the dredge and fill associated with the compensatory mitigation was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

218. The Army Corps' issuance of the Section 10 Permit without a valid, unexpired VI CZMA permit, consistency determination and submerged lands lease for the marina project was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

219. The Section 10 Permit is not valid and legal because it was not issued by the acting district engineer.

220. The Section 10 Permit is not valid and legal because it does not specify the time limit for completing construction of the Project.

4152089_1

221.	The Army Corps' failure to fulfill its obligation not to act as a proponent of the Project was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

222.	The Section 10 Permit does not and cannot provide perpetual protection for the mitigation parcels and therefore the Army Corps issuance of the Section 10 Permit was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

223.	The Army Corps' authorization of Nationwide Permits 1, 18, and 27 for portions of the Project violated 33 C.F.R. § 330.6(d), which permits combining individual and nationwide permits only when the NWP-authorized portions "have independent utility and are able to function or meet their purpose independent of the total project." The compensatory mitigation authorized under NWP 27 has no independent utility apart from offsetting impacts from the marina construction. SEG would not construct the mitigation areas absent approval of the marina. The Army Corps' own Memorandum for Record acknowledges the mitigation "is intended to provide the required compensatory mitigation for the Marina Project if that project is authorized."

224.	Mitigating damage *for* a specific marina cannot, by definition, have independent utility if its sole purpose is to offset the destruction caused by that exact marina. This highlights the absurdity of issuing NWP 27 separately from the Section 10 permit.

225.	The compensatory mitigation approved by the Army Corps in conjunction with the Section 10 Permit was insufficient, infeasible, impractical and was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

40

226.     The Army Corps' reliance on outdated economic data and inadequate minimum vessel clearance was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

227.     For all of these reasons, the Army Corps' issuance of the Section 10 Permit for the Project, which was a final agency action, violated Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and its implementing regulations, and was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

## VII.     SECOND CLAIM FOR RELIEF

### A.     The Army Corps' issuance of the Section 404 Permits violated the Clean Water Act, 33 U.S.C. §§ 1341, 1344, applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706

228.     Plaintiffs incorporate by reference all preceding paragraphs.

229.     The Army Corps' conclusion that the proposed Project is not contrary to the public interest was arbitrary and capricious.

230.     The Army Corps' public interest review violated the Clean Water Act because it failed to adequately study, evaluate and consider the Project's impacts on conservation, aesthetics, historic properties, fish and wildlife concerns, water quality, property ownership, navigation, safety, the general welfare of the public, and economics.  As a result, the Army Corps' public interest review was arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

231.     The Army Corps acted arbitrarily and capriciously, in violation of the law, and without observance of procedure required by law when it improperly and untimely bifurcated or

41

segmented Nationwide Permits 1, 18 and 27 from the Section 10 Permit and the Section 404 individual permitting review and requirements.

232. The Army Corps' failure to hold a public hearing was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

233. The Army Corps' issuance of the Section 404 permits without a valid Water Quality Certification approving modifications to the Project after 2014 and authorizing the dredge and fill associated with the compensatory mitigation was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

234. The Army Corps' issuance of the Section 404 Permit without a valid, unexpired VI CZMA permit, consistency determination and submerged land lease for the marina project was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

235. The Army Corps' failure to fulfill its obligation not to act as a proponent of the Project was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

236. The Section 404 Permits do not and cannot provide perpetual protection for the mitigation parcels and therefore the Army Corps issuance of the Section 404 Permit was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

237. The compensatory mitigation approved by the Army Corps was inadequate, infeasible, impractical and was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

238. The Army Corps' reliance on outdated economic data and inadequate minimum vessel clearance was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

239. The Army Corps' failure to comply with the 404(b)(1) guidelines, 40 C.F.R. § 230.10(a), including failure to conduct an alternatives analysis to determine whether practicable alternatives exist with less adverse impact on the aquatic ecosystem was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law. By bifurcating the Project and authorizing the marina under Section 10 only, the Army Corps evaded the mandatory alternatives analysis required for all Section 404 individual permits.

240. The Army Corps' issuance of Nationwide Permits 1, 18 and 27 without a PCN on Form 4345 was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

241. The Regional Conditions for the 2026 Nationwide Permits in the Caribbean District (SAA) expressly require: "PCN is required for all projects in the Caribbean District's (SAA) area of responsibility, which includes projects within ... the United States Virgin Islands." The Regional Conditions further specify: "PCN for activities in SAA shall be made using Form 4345."

242. Form 4345 requires the applicant to provide critical information regarding the scope and nature of the project and to certify under penalty of perjury that the information is accurate. The Army Corps' counsel confirmed in writing that no Form 4345 or other PCN was submitted for Nationwide Permits 1, 18, or 27. The Army Corps' authorization of these permits without the required PCN constitutes a failure to observe procedure required by law and renders the permits void.

43

243. The Army Corps' authorization of Nationwide Permit 27 was not in compliance with the conditions in Nationwide Permit 27 and was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

244. For all of these reasons, the Army Corps issuance of the Section 404 Permits for the Project, which was a final agency action, violated Sections 401 and 404 of the Clean Water Act, 33 U.S.C. §§ 1341 and 1344, and its implementing regulations, and was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

## VIII. <u>THIRD CLAIM FOR RELIEF</u>

### A. **The Army Corps' Issuance of the Section 10 and Section 404 Permits violated the Coastal Zone Management Act (16 U.S.C. § 1456), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-708**

245. Plaintiffs incorporate by reference all preceding paragraphs.

246. The Army Corps' issuance of the Section 10 and Section 404 Permits without a valid, unexpired VI CZMA permit and consistency determination for the marina project was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

247. The Army Corps' issuance of the Section 10 and Section 404 Permits without a valid VI CZMA permit, consistency determination and land lease for the submerged land was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

248. The federal Coastal Zone Management Act does not preempt or override state coastal zone management programs. To the contrary, the CZMA expressly incorporates state programs by providing that federal permits "shall be carried out in a manner which is consistent

44

to the maximum extent practicable with the enforceable policies" of approved state management programs, 16 U.S.C. § 1456(c)(1)(A), and prohibits federal permit issuance until "the State or its designated agency has concurred with the applicant's certification." 16 U.S.C. § 1456(c)(3)(A). The Army Corps cannot unilaterally determine that an expired state permit satisfies federal consistency requirements.

249. For all of these reasons, the Army Corps' issuance of the Section 10 and Section 404 Permits for the Project, which was a final agency action, violated the Coastal Zone Management Act, 16 U.S.C. § 1456, and its implementing regulations, and was arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law.

## IX.  FOURTH CLAIM FOR RELIEF

### A.  Defendants violated the National Environmental Policy Act (42 U.S.C. §§ 4321 et seq.) and the Administrative Procedure Act (5 U.S.C. §§ 701-706) by failing to prepare an Environmental Impact Statement ("EISS") and Take <u>a</u> "Hard Look"

250. Plaintiffs incorporate by reference all preceding paragraphs.

251. The National Environmental Policy Act ("NEPA") requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

252. In determining whether an action will have a "significant" impact requiring an EIS, agencies must consider the context and intensity of the proposed action, including the unique characteristics of the geographic area, the degree to which the effects are highly controversial, the degree to which the action may establish a precedent, and the presence of historic or cultural resources and ecologically critical areas. 40 C.F.R. § 1508.27.

4152089_1

253. Coral Bay contains extensive sea grass beds, submerged aquatic vegetation, and coral colonies, and was formally designated by the EPA as containing Aquatic Resources of National Importance. The Project is located immediately adjacent to, and proposes mitigation within, the Virgin Islands Coral Reef National Monument and the Virgin Islands National Park.

254. The Project is highly controversial, having generated over 27,000 letters, emails, and comments in opposition from the public and conservation organizations, compared to a mere 13 letters in support.

255. Despite the massive scale of the mega-yacht marina, the unprecedented public controversy, and the irrefutable evidence of significant impacts to ecologically critical areas and historic properties (including an 18th-century shipwreck), the Army Corps failed to prepare an EIS.

256. Instead, the Army Corps relied on an inadequate environmental review that failed to take the requisite "hard look" at the Project's direct, indirect, and cumulative impacts.

257. Specifically, the Army Corps arbitrarily reduced the calculated acreage of indirect habitat impacts from turbidity from 28.44 acres down to a mere 0.34 acres without any justifiable scientific basis, ignored the cumulative impacts of increased vessel traffic and pollution, and failed to rigorously explore objective and practicable alternatives to the Project.

258. The Army Corps' failure to prepare an EIS, its failure to take a hard look at the environmental consequences of the Project, and its reliance on scientifically unsupported data provided by the applicant to minimize apparent impacts, violates NEPA and its implementing regulations.

259. For all of these reasons, the Army Corps' issuance of the Project Approvals without preparing an EIS was arbitrary, capricious, an abuse of discretion, not in accordance

46

with law, and without observance of procedure required by law in violation of the APA, 5 U.S.C. § 706(2).

## X.     FIFTH CLAIM FOR RELIEF

### A.     Defendants violated the Endangered Species Act (16 U.S.C. §§ 1531 et seq.) and the Administrative Procedure Act (5 U.S.C. §§ 701-706) by failing to Ensure Against Jeopardy and Unlawful Circumvention of Formal Consultation

260.    Plaintiffs incorporate by reference all preceding paragraphs.

261.    Section 7(a)(2) of the Endangered Species Act ("ESA") mandates that each federal agency shall, in consultation with the National Marine Fisheries Service ("NMFS") or the U.S. Fish and Wildlife Service, ensure that any action authorized, funded, or carried out by such agency is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).

262.    In fulfilling these requirements, agencies must use the "best scientific and commercial data available." *Id.*

263.    Coral Bay and the Project footprint provide critical habitat and support ESA-listed species, including but not limited to Green sea turtles, Hawksbill sea turtles, Leatherback sea turtles, Nassau grouper, Queen conch, and multiple threatened coral species (e.g., *Acropora*).

264.    The Army Corps initially recognized the potential for adverse effects to these species and initiated formal Section 7 consultation in 2018. However, due to SEG's repeated failures to provide required environmental data (including benthic surveys, sea turtle surveys, and acoustic impact studies for the driving of over 1,300 piles), NMFS was previously forced to close consultation.

4152089_1

265.    Following political intervention in late 2023, the Army Corps abruptly abandoned the formal Section 7 consultation process. Instead, the Army Corps drafted an "Expedited Informal Endangered Species Act Consultation" to bypass the rigorous analysis required under the ESA.

266.    To justify this expedited and informal process, the Army Corps arbitrarily adopted the applicant's unsupported assertions, including allowing a minimum vessel clearance of only 1.5 feet at mean low tide, in direct defiance of NOAA's prior consultation requiring a 2.5-foot minimum clearance to avoid catastrophic propeller scarring to sea grass beds and listed species habitat.

267.    Further, the Army Corps approved the Project allowing impact pile driving instead of vibratory pile driving, failing to properly analyze or mitigate the severe acoustic impacts on ESA-listed sea turtles and marine mammals, and inexplicably claimed it could not open or review documents submitted by Plaintiffs' experts detailing impacts to sea turtle habitat.

268.    By abandoning formal consultation despite clear evidence that the Project "may affect" and is "likely to adversely affect" listed species, and by failing to utilize the best scientific and commercial data available, the Army Corps violated Section 7 of the ESA.

269.    For all of these reasons, the Army Corps' issuance of the Project Approvals was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law in violation of the APA, 5 U.S.C. § 706(2).

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare that the Army Corps acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with the law in violation of the Administrative

48

Procedure Act, 5 U.S.C. § 706(2)(A) 5 USCS § 706 and Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and applicable regulations when it issued the Section 10 Permit without obtaining a valid Water Quality Certification under Section 401 of the Clean Water Act, 33 U.S.C. § 1341, without obtaining a valid VI CZMA permit and consistency determination, and without conducting an adequate public interest review as required by 33 C.F.R. § 320.4(a).

B.      Declare that the Army Corps acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with the law in violation of the Administrative Procedure Act and Clean Water Act and applicable regulations when it issued the Nationwide Permits 1, 18 and 27 and issued the Project Approvals without an individual Section 404 permit and compliance with 404(b)(1) guidelines.

C.      Declare that the Army Corps acted arbitrarily and capriciously, abused its discretion, and otherwise acted not in accordance with the law in violation of the Administrative Procedure Act and Section 307(e) of the federal Coastal Zone Management Act and applicable regulations and guidance when it issued the Section 10 and Section 404 permits without a valid VI CZMA permit and consistency determination.

D.      Vacate the Army Corps' Section 10 and Section 404 permits for the Project.

E.      Vacate the Army Corps' Memoranda for the Record for the Section 10 and Section 404 permits.

F.      Enjoin any activities in furtherance of the Project if and until new and lawful approvals for the Project are issued by the Army Corps.

G.      Grant Plaintiffs their costs of suit, including reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and 5 U.S.C. § 504, to the extent authorized by law.

49

H.     Grant Plaintiffs such further relief as the Court deems just and proper.

Respectfully submitted,


/s/ Melody D. Westfall
Melody Westfall (R2052)
Westfall Law PLLC
Gallows Bay
5032 Anchor Way, Suite 8
Christiansted, St. Croix, VI  00820
Tel: (340) 227-0017
mwestfall@westfalllaw.com


Dated:  August 5, 2026

4152089_1